1

2

3

4

5                  UNITED STATES DISTRICT COURT

6                 EASTERN DISTRICT OF WASHINGTON

7   In Re:

8   LLS AMERICA, LLC,                    NO:  2:12-CV-423-RMP

9                          Debtor,        Bankr. Case No. 09-06194-FPC11

10  BRUCE P. KRIEGMAN, solely in his      Adv. Proc. No. 11-80095-FPC
    capacity as court-appointed Chapter 11
11  Trustee for LLS America, LLC,         FINDINGS OF FACT AND
                                          CONCLUSIONS OF LAW
12                         Plaintiff,

13  v.

14  1127477 ALBERTA LTD, et al.,

15                         Defendants.

16

17        This consolidated action was tried before the Court commencing on

18  October 27, 2014.  Plaintiff, Bruce P. Kriegman, the court-appointed Chapter 11

19  Trustee for LLS America, LLC ("Trustee"), was represented by Michael Loft and

20  Matthew Mensik of Witherspoon Kelley.  Defendants Keith Alexander ("Mr.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

Alexander") and 1127477 Alberta, Ltd. (the "Alberta Company") (collectively, "Defendants") were represented by Dillon Jackson and Adam Coady of Foster Pepper.  The Court heard witness testimony and, having reviewed the admitted exhibits and being fully informed, makes the following findings of fact and conclusions of law:

## PREVIOUS RULINGS

### 1.    Ponzi Scheme and Insolvency

On July 1, 2013, the Bankruptcy Court issued its Report and Recommendation Re Plaintiff's Motion for Partial Summary Judgment on Common Issues ("Report and Recommendation") recommending that the District Court grant the Trustee's Amended Motion for Partial Summary Judgment on two "Common Issues": (1) Debtor operated a Ponzi scheme; and (2) Debtor was insolvent at the time of its transfers to Defendants.  On August 19, 2013, this Court adopted the Bankruptcy Court's Report and Recommendation and entered an order granting the Trustee's Amended Motion for Partial Summary Judgment on the Common Issues ("Order Adopting Report and Recommendation").  *See* 2:11-cv-00357-RMP, ECF No. 92.  Therefore, this Court has determined that Debtor operated a Ponzi scheme and was insolvent at the time of each of the transfers to Defendants.

All of the findings and conclusions set forth in the Report and Recommendation and the Order Adopting Report and Recommendation are incorporated by this reference and are the law of this case.

**2.    Omnibus Hearing for the Testimony of Charles B. Hall**

On January 31, 2014, this Court entered its Order Granting Plaintiff's Motion for Omnibus Hearing.  ECF No. 47.  Pursuant to that Order, the court-appointed examiner, Charles B. Hall, testified at an Omnibus Hearing in open court commencing on February 25, 2014.  His testimony consists of written direct examination testimony that was filed on or about February 17, 2014, and the oral testimony that he gave at the Omnibus Hearing.  Mr. Hall was cross examined by several defense attorneys and by some pro se defendants.  Mr. Hall's testimony at the Omnibus Hearing is part of the record in this adversary action.

## FINDINGS OF FACT

1.    Debtor is the Little Loan Shoppe group of companies, which was formed originally in 1997.  PO-1 at 11.

2.    Debtor operated a Ponzi scheme, whereby investors' loans sometimes were used to pay other investors' promised returns on investments.  PO-1 at 16.

3.    Over the course of its existence, Debtor acquired approximately $135.4 million from investments made by individual lenders, usually documented

by promissory notes offering interest returns in the range of 40% to 60% per annum.  PO-1 at 7 n.2, 15.

4.    Debtor accumulated payday loan bad debts of approximately $29 million, which were written off in 2009.  PO-1 at 41.

5.    Debtor was never profitable at any time during its existence and at no time did it generate sufficient profits to pay the amounts due the lenders.  PO-1 at 16, 53.

6.    The Alberta Company is a lender that received payments from Debtor.

7.    Mr. Alexander, on behalf of the Alberta Company, filed a proof of claim (Claim No. 293-1 for $3,167,785.46).

8.    The relevant conduct largely occurred in Spokane, Washington.  *See* 2:11-cv-00362-RMP, ECF No. 148.

9.    Defendants received promissory notes that were executed in Washington State.  *See, e.g.*, P-12.

10.    Debtor ordered "stop payment" on some of the checks that it had given to Defendants, and other checks bounced.  *See, e.g.*, P-26 at 11-27, P-29 at 19; P-30 at 9.

11.    Debtor voided approximately 29,000 of the post-dated checks that it had issued to lenders, including Defendants.  PO-1 at 26; P-16.

12.    Defendants were given not sufficient funds ("NSF") checks or received post-dated checks that were voided by Debtor.  P-16; P-17 at 28, 29.

13.    Defendants received promissory notes that were rolled into or renewed by other promissory notes.  *See, e.g.*, P-10 at 2; P-11 at 4.

14.    All of the transfers that the Trustee seeks to avoid were made within the period of September 1997 to July 21, 2009.  *See* P-13.

15.    Indicia and characteristics of the Ponzi scheme present in this case include:

a.    Proceeds received from new investors masked as profits from running a payday loan business; PO-1 at 16, 22;

b.    Promise of a high rate of return, usually between 40% to as much as 60%, on the invested funds; PO-1 at 19;

c.    Debtor paid commissions to third parties who solicited new lenders, typically 10% of the amount received from the new lender; PO-1 at 20-21;

d.    Debtor solicited funds as loans evidenced by promissory notes but demonstrated a pattern of "rolling over" the promissory notes when due onto new notes instead of paying off the obligation; PO-1 at 26;

e.    Debtor, throughout its history, made false and misleading statements to current and potential lenders; PO-1 at 53-54;

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5

f.    Debtor was insolvent from its inception to the filing of its bankruptcy; PO-1 at 67.

16.    The court-appointed examiner, Charles B. Hall, by way of education, experience, and vocation, is qualified to analyze and review the legitimacy of an enterprise's operation and to detect a fraud based on Ponzi scheme operations.

17.    Mr. Hall's expert opinion is credible.

18.    Curtis Frye's testimony, which pertained to Debtor's record keeping and the accounting of investment, payments, and consulting fees/commissions to Defendants, is credible.

19.    Defendants received interest and principal payments from Debtor.

20.    Defendants are "net winners."

21.    The evidence does not show that Defendants conducted meaningful due diligence prior to investing in Debtor. *See* P-17 at 14-15, 26.

22.    Defendants were promised high rates of return from Debtor of 60% per annum. P-12.

23.    Defendants received post-dated checks from Debtor in advance of the time that payment would become due under Debtor's promissory notes. P-14; P-16; P-17 at 28.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 6

24.     Defendants loaned funds to Debtor after Debtor had "rolled" earlier loans into new promissory notes when payment had become due.  *See* P-10 at 2 *and* P-13 at 2; *see also* P-11 at 4.

25.     Mr. Alexander was the President of the Alberta Company.  P-11 at 1.

26.     At all material times, the Alberta Company acted under the control and at the direction of Mr. Alexander.

27.     Mr. Alexander formed the Alberta Company after conferring with Debtor's President, Doris Nelson ("Ms. Nelson"), about a method to solicit lenders whose money would be put in the hands of Debtor.  *See* P-17 at 14-15.

28.     Mr. Alexander used the Alberta Company to deliver third parties' monies to Debtor in exchange for payments amounting to 10%-30% of the per annum interest received on the third-parties' monies.  P-17 at 20.

29.     The Alberta Company maintained business accounts that were separate from Mr. Alexander's personal accounts.

30.     In 2005, Mr. Alexander began to solicit monies from third parties.

31.     Mr. Alexander represented to third parties that the Alberta Company would send their monies to Debtor and promised repayment on their monies of 30%-40% per annum interest.  *See* D-224 at 6-69.

32.     Defendants argue that the law of the case is that the terms of the promissory notes do not demonstrate a lack of good faith.  ECF No. 90 at 6.

Defendants note that Plaintiff released its claims against net-negative investors who received similar promissory notes. Defendants also allege that the Court has found that ten "triggering creditors" were good faith investors even though they received promissory notes that were similar in content to Debtor's notes that are at issue in this matter. *See* 2:11-cv-00362-RMP, ECF No. 197.

33.     However, Defendants have not established how Plaintiff's agreement to release its claims against net-negative investors necessarily indicates that they invested in good faith. Additionally, the Court's order regarding "triggering creditors" was more limited than Defendants imply. The issue before the Court was whether any creditor existed who held a valid claim against Debtor at the time when the bankruptcy petition was filed. *See* 2:11-cv-00362-RMP, ECF No. 197 at 5. The primary concern was whether the triggering creditors were within Washington State's statute of limitations, which would allow a cause of action brought "'within one year after the transfer of obligation was or could reasonably have been discovered by the claimant . . . .'" *See* 2:11-cv-00362-RMP, ECF No. 197 at 6 (quoting RCW 19.40.091(a)). Because the triggering creditors made their first investments within one year prior to the bankruptcy petition, the one-year statute of limitations would not have passed by the time that the bankruptcy petition was filed, even assuming that the triggering creditors learned of Debtor's fraud on the same day that they invested. 2:11-cv-00362-RMP, ECF No. 197 at 9.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

Therefore, the triggering investors' good faith was irrelevant to the Court's order. Defendants have not shown that the terms of the promissory notes are immaterial to the issue of good faith.

34.     The Alberta Company issued its own promissory notes and post-dated checks to the third parties solicited by Mr. Alexander.  *See, e.g.*, D-224 at 6-69 (promissory notes).

35.     The Alberta Company used the third parties' monies for investment in Debtor.  P-17 at 20.

36.     Debtor issued promissory notes to the Alberta Company, naming the Alberta Company as payee and promising to pay 60% per annum interest, accompanied by post-dated checks, which also named the Alberta Company as the payee.  P-12; P-14; P-17 at 28.

37.     The third parties had no contact or business relationship with Debtor. The third parties' relationships were with Mr. Alexander.  *See* P-24; P-27; P-28.

38.     The Alberta Company had no independent means by which to pay the checks that the Alberta Company gave to third parties and was entirely dependent on payments from Debtor.  *See* P-18; P-29; P-30.

39.     Mr. Alexander did not inform the Alberta Company's investors how much of the interest payments received by the Alberta Company from Debtor that the Alberta Company would keep.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 9

40.    The Alberta Company kept the 10%-30% difference in payments.  P-17 at 20; *compare* P-12 (promissory notes from Debtor to the Alberta Company) *with* P-24 (promissory notes from the Alberta Company to third parties).

41.    Neither Mr. Alexander nor the Alberta Company was licensed to deal in securities in the provinces of British Columbia or Alberta.  *See* P-17 at 35-36.

42.    The Alberta Company was not adequately capitalized for the activity in which it was engaged.

43.    Mr. Alexander exercised dominion over payments received by the Alberta Company from Debtor.

44.    All funds received by the Alberta Company were commingled in the Alberta Company's sole bank account with incoming payments from Debtor, and funds in the account were not segregated.  *See* P-29; P-30.

45.    The Alberta Company renewed promissory notes from Debtor, notes procured with third parties' monies, and allowed Debtor to consolidate those notes into one loan for $1,650,000.00.  *See* P-11 at 4.

46.    Mr. Alexander was one of two shareholders in the Alberta Company. The second shareholder was Mr. Alexander's step-father, Brian Alexander ("Brian").  Brian played no apparent role in the creation or business decisions of the Alberta Company.  *See* Joint Ex. No. 1 at 76-77, 79.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10

47.    Mr. Alexander testified that when he learned of Debtor's need to restructure its promissory notes, he returned funds to a friend who had intended to invest in the Alberta Company.

48.    Mr. Alexander voluntarily dissolved the Alberta Company on July 9, 2012.  D-229.

49.    The Court finds that Defendants knew or should have known of the fraudulent nature of Debtor's scheme.  In addition to red flags that are common among most of Debtor's investors, such as missed payments, lack of financial statements, and high rates of return on investments with Debtor, Defendants also should have been wary of the extremely lucrative compensation that Debtor offered in exchange for Defendants' efforts to bring new investors into the enterprise.  At trial, Defendants objected to the characterization of the payments that the Alberta Company received from Debtor as "commissions," because, unlike payments "earned" by other transferees in this Ponzi scheme, the Alberta Company simple took part of the funds under the standard terms of Debtor's promissory notes and passed the remaining money along to the Alberta Company's own investors.  In other words, Defendants contend that the Alberta Company did not receive independent "commission" payments, and that the "overrides" that it was offered were less of a red flag than commissions because they were received only if Debtor actually paid on the underlying investment.

50.    However, regardless of the term used to describe the payments, the evidence establishes that the Alberta Company received compensation that was suspiciously high in comparison to the company's efforts.  Without any need to contribute its own capital, and in return for merely funneling money into Debtor's scheme, the Alberta Company generally received one third of the payments that Debtor offered for investments that came from the Alberta Company's investors.  Moreover, the Alberta Company apparently was aware of its inability to honor its promissory notes in the event of Debtor's default because it began adding to promissory notes the provision that only Debtor, not the Alberta Company or Mr. Alexander, would be liable if payments were not made due to Debtor's default.  *See* D-224 at 6-60.

51.    The parties agree that the Alberta Company deposited a total of $1,620,000.00 CAD with Debtor between the years of 2004 and 2008.  ECF No. 95 at 2.

52.    The parties agree that the Alberta Company received a total of at least $1,857,890.00 CAD in payments from Debtor between the years of 2005 and 2009.  ECF No. 95 at 2.

53.    Plaintiff contends that the Alberta Company received two additional payments from Debtor: $4,000.00 CAD on October 17, 2008, and $15,291.66 CAD on October 31, 2008.  ECF No. 95 at 2.  Debtor's bank records indicate that

Debtor transferred these amounts to the Alberta Company on the respective dates. P-14 at 227, 228. However, neither the Alberta Company's ledger nor its own bank records reflect that the transfers were received. *See* D-221 at 130-31, 132-33. The parties provided evidence of only one account in the Alberta Company's name, and the company's bank statements from that time period reflect transfers from Debtor that also are recorded in the company's ledger. *Compare, e.g.*, P-18 at 33 *with* D-221 at 134. The Court finds that the preponderance of the evidence does not establish that the Alberta Company received these transfers. Accordingly, they will not be included in the Court's calculations.

54. The Alberta Company and Mr. Alexander are net winners. The following summarizes the evidence of investments made by the Alberta Company and Mr. Alexander, and the payments that the Alberta Company and Mr. Alexander received from Debtor:

|  |  |
|---|---|
| Total Payments: | $1,857,890.00 CAD |
| Total Investments: | $1,620,000.00 CAD |
| MIMO: | $237,890.00 CAD |

55. All transfers to Defendants were made with actual fraudulent intent and in furtherance of a Ponzi scheme.

56. Mr. Alexander, on behalf of the Alberta Company, filed a proof of claim (Claim No. 293-1 for $3,167,785.46).

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13

57.    Plaintiff requests the Court to pierce the corporate veil and hold Mr. Alexander liable for any judgment that the Court imposes on the Alberta Company.

58.    The parties previously disagreed about whether Canadian or Washington State law applied to the issue of piercing the corporate veil or corporate disregard.  However, in their trial brief, Defendants stipulated that the laws of the two jurisdictions essentially are the same on this matter and Defendants discuss Washington law.  *See* ECF No. 90 at 12-13.

59.    Washington courts have established two factors necessary to show that the corporate form should be disregarded.  "First, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be 'necessary and required to prevent unjustified loss to the injured party.'"  *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wn. 2d 403, 410 (1982) (quoting *Morgan v. Burks*, 93 Wn.2d 580, 587 (1980)).  "With regard to the second element, wrongful corporate activities must actually harm the party seeking relief so that disregard is necessary." *Id.*

60.    A court may pierce the corporate veil under the alter ego theory "when 'the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist.'"  *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548,

553 (1979) (quoting *Burns v. Norwesco Marine, Inc.*, 13 Wn. App. 414, 418 (1975)).  *See also J. I. Case Credit Corp. v. Stark*, 64 Wn. 2d 470, 475 (1964) ("[T]here must be such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others.").

61.    Undercapitalization of a corporate entity, by itself, does not constitute abuse of the corporate form, *Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 61 Wn. App. 395, 399-400 (1991), although "there may be situations in which a corporation is so thinly capitalized that it manifests a fraudulent intent," *Truckweld Equip. Co., Inc. v. Olson*, 26 Wn. App. 638, 645 (1980).

62.    The Court finds that Mr. Alexander intentionally used the Alberta Company to evade a duty and that disregard of the corporate form is necessary to avoid unjustified loss.  While it is undisputed that Mr. Alexander observed some corporate formalities in commencing and operating the Alberta Company, the primary purpose of the Alberta Company was to aid a fraudulent enterprise by feeding additional money into a Ponzi scheme.  In return for bringing new contributors into Debtor's scheme, the Alberta Company was rewarded with 10% to 30% of the payments received from Debtor.

63.    Additionally, consistent with its limited purpose of acquiring new funds for Debtor, the Alberta Company was significantly underfunded.  The

company issued promissory notes for principal investments that totaled over one million dollars, D-224 at 6-28, but owned no land, inventory, or capital that was significant in light of its liabilities.   Moreover, Mr. Alexander dissolved the Alberta Company after Debtor's bankruptcy began and he explained at trial that it was not feasible to pay to keep the company in existence.  Without the connection to Debtor's Ponzi scheme, it was impracticable for the Alberta Company to continue operating.

64.     Furthermore, Mr. Alexander, acting through the Alberta Company, attempted to evade liability both for himself and for the entity in promissory notes issued to investors.  The later promissory notes held by the Alberta Company's investors provide that upon Debtor's default, the note holders could seek relief only from Debtor, not from the Alberta Company or from Mr. Alexander.  D-224 at 6-60.  Under this arrangement, the Alberta Company and Mr. Alexander would have the opportunity to reap significant profits from Debtor's Ponzi scheme without incurring any additional risk.

65.     Finally, the evidence establishes that Mr. Alexander used some of the Alberta Company's funds for the benefit of himself and his family, and to the detriment of the Alberta Company's creditors.  While Mr. Alexander sufficiently explained at trial that some of the charges that Plaintiff challenged were valid business expenses, including recreational trips with investors and vehicles that

were used by the company, other transfers of company funds unjustly benefitted Mr. Alexander and his parents.   In particular, the Alberta Company's ledger reveals that the largest payments that the company made in its final transactions were to Mr. Alexander, his parents, or another of Mr. Alexander's companies, Kaos Enterprises.  *See* P-18 at 36-37.  For example, Kathy Alexander, Mr. Alexander's mother and an employee of the Alberta Company, regularly earned wages of either $1,000 or $2,000 from 2006 through 2009, other than one bonus of $9,493.98.  P-17 at 21-22.  However, after the Alberta Company stopped receiving checks from Debtor, its primary source of revenue, Defendants' interrogatory responses show that Kathy Alexander received two payments of $10,000.  *See* P-17 at 22; P-13 at 4.  Similarly, Brian Alexander, Mr. Alexander's stepfather, who was paid $1,000 per month during the first half of 2009, was given an additional $10,000 after Debtor stopped paying the Alberta Company.  P-17 at 22-23; P-13 at 4.  Kaos Enterprises received $15,000, and Mr. Alexander himself received $10,000.  P-18 at 36.  Mr. Alexander surely was aware at this time that the Alberta Company's resources would need to be spared in light of Debtor's dilemmas.

66.   Although Defendants contend that piercing the corporate veil is improper because Plaintiff has not demonstrated that it was injured, Plaintiff is the trustee for Debtor's bankruptcy estate, which will be used to compensate victims

of the Ponzi scheme.  If the corporate veil were left intact, the estate would be harmed by Mr. Alexander's use of the corporate form to funnel money into Debtor's fraudulent scheme through an entity that lacks any significant funds.

67.    The Court finds that disregard of the corporate form and imposition of joint and several liability is necessary to minimize the injury to Debtor's estate, the Trust established pursuant to the confirmed plan of reorganization, and creditors of each.  Accordingly, the Court pierces the corporate veil.

## CONCLUSIONS OF LAW

1.    The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(d).

2.    The Court has jurisdiction over the Alberta Company because it filed a proof of claim in Debtor's bankruptcy.  *See Katchen v. Landy*, 382 U.S. 323, 335 (1966).

3.    The parties dispute whether the Court has jurisdiction over Mr. Alexander.  Personal jurisdiction over a non-resident defendant may take one of two forms:  general jurisdiction or specific jurisdiction.  *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  General jurisdiction may be exercised over a defendant who has established "substantial" or "continuous and systematic" contacts with the forum, regardless of whether the cause of action arose from those contacts.  *Id.*  Because Plaintiff apparently does

not contend that general jurisdiction exists, the Court considers whether it has specific jurisdiction over Mr. Alexander.

4.    Specific jurisdiction may be exercised only when the plaintiff's cause of action arises from the defendant's specific contacts with the forum. *Bancroft & Masters*, 223 F.3d at 1086.  The following three-part test controls:

> (1) The non-resident defendant must *purposefully direct his activities* or consummate some transaction with the forum or resident thereof; *or* perform some act by which he *purposefully avails himself* of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227-28 (9th Cir. 2011) (emphasis in original) (quoting *Schwarzeneggar v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).  The plaintiff bears the burden of establishing that the first two prongs have been satisfied. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).  If the plaintiff is successful, the burden shifts to the defendant "to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

5.    The first prong of the specific jurisdiction inquiry "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).  The "purposeful availment" test generally applies to cases sounding in contract, while courts in the Ninth Circuit use the "purposeful direction" test for tort cases.  *Schwarzenegger*, 374 F.3d at 802.

6.    Under these circumstances, the Court applies the purposeful availment test.  Courts analyze purposeful availment by considering "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . ."  *Burger King*, 471 U.S. at 479.  Here, Mr. Alexander invested considerable sums of money in Debtor, which he knew was operating both in Canada and in Spokane, Washington.  Mr. Alexander also came to Spokane twice to visit Debtor's business and he testified that usually he would contact Ms. Nelson through her Spokane telephone number.   Although the promissory notes from Debtor indicate that they would be governed by Canadian law, the evidence establishes that Mr. Alexander purposefully availed himself of the benefits and protections of doing business in Washington State.  Accordingly, the first factor regarding specific jurisdiction is established.

7.    Turning to the next factor, the Court concludes that Plaintiff's action arises from Mr. Alexander's forum-related activities.  Plaintiff seeks to recover transfers that Defendants received in return for investing in Debtor's fraudulent business, which was based in Spokane, Washington.

8.    Finally, the Court considers whether the exercise of jurisdiction over Mr. Alexander is reasonable.  Seven factors are relevant to this inquiry:

> (1) the extent of the defendant's purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002).  "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477

9.    The Court considers each of the seven reasonableness factors in turn.  First, as discussed above regarding purposeful availment, Mr. Alexander had extensive contacts with Spokane by investing considerable sums of money in Debtor, visiting Debtor's Spokane business, and communicating with Ms. Nelson, who lived in Spokane.  This factor weighs in favor of finding that the Court's exercise of jurisdiction is reasonable.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 21

10.    Regarding the second factor, the Court recognizes the burden that is imposed on Mr. Alexander by having to participate in litigation in a foreign country. This factor weighs against the reasonableness of the Court's jurisdiction.

11.    The third factor is neutral because neither party has raised a significant conflict between the relevant laws in this forum and in Mr. Alexander's home jurisdiction. Although Defendants earlier contended that Canadian law applied to the matter of piercing the corporate veil, they later conceded that Canadian law was substantially the same as Washington law on that regard.

12.    The fourth factor, pertaining to the forum state's interest in adjudicating the dispute, weighs in favor of finding that the Court's exercise of jurisdiction over Mr. Alexander is reasonable. As the Court previously has found, the relevant conduct in Debtor's Ponzi scheme occurred in Spokane, such that this forum has an interest in resolving the matter. *See* 2:11-cv-00362-RMP, ECF No. 148.

13.    Under the fifth factor, the most efficient judicial resolution of this dispute strongly weighs in Plaintiff's favor. The Trustee is attempting to recover fraudulent transfers from defendants located throughout the United States, Canada, and countries on other continents. It would be a waste of the bankruptcy estate and of judicial resources if Plaintiff were required to travel around the world to litigate related legal issues before an extensive number of courts.

14.     The sixth factor, the importance of this forum to Plaintiff's interest in convenient and effective relief, also weighs in Plaintiff's favor.  Plaintiff's counsel and Mr. Frye, who has testified at trial on multiple adversary proceedings related to Debtor's bankruptcy, reside in Spokane, such that this is a convenient forum for Plaintiff.

15.     The existence of an alternative forum, the seventh factor, weighs in Mr. Alexander's favor.  Plaintiff presumably could have sought relief from a Canadian court.

16.     In sum, four factors weigh in favor of concluding that the Court's exercise of jurisdiction is reasonable, two factors weigh in Mr. Alexander's favor, and one factor is neutral.  Under these circumstances, the Court concludes that Mr. Alexander has failed to set forth a compelling case that the Court's exercise of jurisdiction would not be reasonable.

17.     In light of the above analysis, the Court concludes that it has jurisdiction over Mr. Alexander.

18.     This action was timely commenced.

19.     At least one unsecured creditor existed who triggered the strong arm power of 11 U.S.C. § 544(b)(1) because the creditor did not and should not reasonably have discovered the fraudulent nature of Debtor's Ponzi scheme

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 23

transfers within one year before the bankruptcy petition was filed.  *See* 2:11-cv-00362-RMP, ECF No. 197.

20.    Washington State law governing fraudulent transfers applies.

21.    Under the statutes relating to fraudulent transfers, 11 U.S.C. § 548 and RCW 19.40, *et seq.*, payments received from Debtor are recoverable from each Defendant by the Trustee, subject to the defense of good faith pursuant to 11 U.S.C. § 548(c) and RCW 19.40.081(a).

22.    Transfers made in furtherance of a Ponzi scheme constitute actual fraud under the Bankruptcy Code and Washington's version of the Uniform Fraudulent Transfer Act (UFTA).  *See* Bankr. Adv. Doc. 11-80299-FPC, ECF No. 378 at 21-25.  "Where causes of action are brought under the UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers . . . ."  *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).

23.    A transferee of an actually fraudulent transfer may keep funds that it took for value (or, under state law, for reasonably equivalent value) and in good faith.  11 U.S.C. § 548(c); RCW 19.40.081(a).  As recipients of transfers that constitute actual fraud, the burden of proof in establishing the affirmative defense of good faith is on Defendants.  *In re Agric. Research and Tech. Grp., Inc.*, 916

F.2d 528, 535 (9th Cir. 1990); 5 *Collier on Bankruptcy* ¶ 548.09[2][c] at 548-98.2 (16th ed. 2011).

24.    Although "good faith" is not defined precisely in case law, at least one court has noted that the absence of good faith is shown by a transferee who knows that a debtor is operating a Ponzi scheme. *See In re Agric. Research*, 916 F.2d at 535 (citing *In re Indep. Clearing House*, 77 B.R. 843, 861 (D. Utah 1987)).  The Ninth Circuit has quoted favorably an explanation in an early case that a transferee's "knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors . . . should be deemed to have notice . . . as would invalidate the sale as to him." *Id.* (quoting *Shauer v. Alterton*, 151 U.S. 607, 621 (1894)).

25.    Thus, courts measure good faith by an objective standard, looking to what a transferee "'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Id.* at 536.

26.    Under the Bankruptcy Code, Washington's UFTA, as well as relevant case law, the Court does not contemplate a recipient's intent when deciding whether to avoid fraudulent transfers.  5 *Collier on Bankruptcy* ¶ 548.04[2] at 548-63; *Thompson v. Hanson*, 168 Wn.2d 738, 749 (2009).  Accordingly, a transfer that constitutes actual fraud is avoided in its entirety unless the transferee establishes

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 25

that a reasonable person in the transferee's position would not and should not have known of the fraud, not simply whether he or she *actually* acted in good faith.

27.    Transfers made by Debtor in furtherance of its Ponzi scheme are transfers made with actual intent to hinder, delay and/or defraud creditors under both state law, RCW Ch. 19.40, and federal law, 11 U.S.C. § 548(a)(1).

28.    Defendants failed to meet their burden to establish good faith and, thus, Defendants are required to return the entire amount of the transfers that they received, including principal and interest.

29.    The Trustee is entitled to claw back and recover all transfers to Defendants.

30.    Under RCW 19.40.041(a)(1), RCW 19.40.091(a) and the "strong arm powers" that 11 U.S.C. § 544(b)(1) grants to bankruptcy trustees, all of Debtor's transfers to Defendants, regardless of the date of transfer, are hereby set aside and avoided.

31.    The Trustee is entitled to recover all transfers to the "initial transferees" of fraudulent transfers.  11 U.S.C. § 550(a).

32.    Defendants were not a "mere conduit" with respect to the transfers that Plaintiff seeks to avoid.  The Ninth Circuit has adopted the "dominion" test for determining whether a person or entity is an initial transferee from whom recovery can be had, or instead a "mere conduit."  *In re Incomnet, Inc.*, 463 F.3d 1064, 1069

(9th Cir. 2006).  According to the dominion test, "a transferee is one who . . . has 'dominion over the money or other asset, the right to put the money to one's own purposes.'"  *Id*. at 1070 (quotation marks omitted).  The inquiry under the dominion test "focuses on whether an entity had legal authority over the money and the right to use the money however it wished." *Id*.  A defendant relying on this defense bears the burden of proving that it did not have the requisite dominion.  *In re Maui Indus. Loan & Finance Co.*, 477 B.R. 134, 145 (Bankr. D. Haw. 2012).

33.    The Alberta Company, operating through Mr. Alexander, was the initial transferee of all payments received from Debtor.  *See* P-14; P-29; P-30.  Plaintiff is entitled to recover all transfers to these Defendants.

34.    Washington State law governs whether or not the Alberta Company's corporate veil should be pierced and Mr. Alexander should be held jointly and severally liable with the Alberta Company for all transfers received from Debtor.

35.    The Trustee is entitled to pre-judgment interest at the applicable federal rate from July 21, 2009, when the bankruptcy case commenced.

36.    Because the Court has pierced the corporate veil, Mr. Alexander is jointly and severally liable for all amounts herein awarded against 1127477 Alberta.

37.    Plaintiff requests the Court to equitably subordinate Defendants' claims against Debtor's estate.  "Equitable subordination requires that (1) the

claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; and (3) subordination is not inconsistent with bankruptcy law." *Paulman v. Gateway Venture Partners III, L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 583 (9th Cir. 1998) (quoting *Spacek v. Thomen* (*In re Universal Farming Indus.*), 873 F.2d 1334, 1337 (9th Cir. 1989)) (internal quotation marks omitted).

38. The Court equitably subordinates Defendants' claims, although the Court recognizes that Mr. Alexander has not filed a claim against the estate. Defendants' conduct was inequitable in that they recruited other investors without investigating the signs that Debtor's business was fraudulent. This misconduct contributed to Debtor's successful operation of its Ponzi scheme. Accordingly, all proofs of claim that may hereafter arise or that have been filed or brought or that may hereafter be filed or brought by, on behalf of, or for the benefit of Defendants, against Debtor's estate, in Debtor's bankruptcy or related bankruptcy proceedings are subordinated to all other unsecured claims, pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a).

39. Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **1127477 Alberta, Ltd., and**

**Keith Alexander, jointly and severally**, in the amount of **$1,857,890.00 CAD**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

40.    The Trustee is entitled to reimbursement of its costs for pursuing this action.

41.    All proofs of claim filed by any Defendants in Debtor's Bankruptcy proceedings or any claims that may hereafter arise are disallowed pursuant to 11 U.S.C. § 502(d) unless and until the avoided transfers are returned to the Trustee.

42.    The Trustee is awarded all applicable interest, costs and disbursements of this action against each Defendant.

**IT IS SO ORDERED**.

The District Court Executive is directed to enter this Order and to provide copies to counsel.

**DATED** this 23rd day of January 2015.


_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
Chief United States District Court Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 29